UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

**GREGORY L. GRIFFITH**                                         **CIVIL ACTION**

**VERSUS**                                                      **NO. 14-470-RLB**

**O'REILLY AUTOMOTIVE
STORES, INC.**

**RULING GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Before the Court is Defendant's Motion for Summary Judgment. (R. Doc. 34). Plaintiff filed an Opposition in response to the Motion (R. Doc. 52), to which Defendant filed a Reply Memorandum (R. Doc. 59). For the reasons given below, Defendant's Motion for Summary Judgment in **GRANTED** and Plaintiff's cause of action is dismissed with prejudice.

I.   BACKGROUND

In this action, Plaintiff claims that Defendant violated Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. §§ 2000e-2, 2000e-3, and the Louisiana Employment Discrimination Law (LEDL), La. Rev. Stat. § 23:332, by subjecting Plaintiff to racial harassment, constructively discharging him because of his race (African American); and retaliating against Plaintiff for opposing unfair treatment. (R. Doc. 1).

Plaintiff began working for O'Reilly Automotive Stores, Inc., on February 12, 2007 as a delivery specialist. On November 16, 2010, Plaintiff was promoted to City Delivery Dispatcher or "Hub Supervisor" at Store No. 633. (R. Doc. 34-3 at 7); (R. Doc. 34-3 at 37). As Hub Supervisor, Plaintiff received electronic orders from other stores, pulled the inventory ordered by

each store, organized the inventory to be delivered to each store, and supervised the drivers delivering that inventory. (R. Doc. 34-10 at 8). The job required Plaintiff to be up and on his feet for much of the day. (R. Doc. 34-10 at 18).

Plaintiff claims that he failed to receive a raise in connection with his promotion to Hub Supervisor, as promised by the district manager, Richard Blackwell. However, following his promotion, Plaintiff received two raises — the first on December 5, 2010 and the second on January 2, 2011. (R. Docs. 34-4 to 34-6); (R. Doc. 34-7 at 23-24). Plaintiff also claims that Cheryl Kimball cursed at Plaintiff and was unprofessional towards Plaintiff on more than one occasion. (R. Doc. 52-3 at 39-42). For example, Plaintiff claims that Ms. Kimball cursed at him and called him "dumb" for a mistake made by one of the drivers he supervised. (R. Doc. 1 at 2-3); (R. Doc. 34-3 at 9-13). Plaintiff reported the incident to his store manager at the time, Ms. Karen Taplin, and the two informed Richard Blackwell of the incident, as well. (R. Doc. 34-3 at 10-13).

Several months later when Ms. Kimball was made manager of Plaintiff's store (Store No. 633) in March of 2011, Plaintiff claims that Ms. Kimball retaliated against him by removing his personal stool from his workstation. (R. Doc. 1 at 3); (R. Doc. 52 at 1). Plaintiff also claims that prior to becoming Plaintiff's district manager, Clint Reaux told Plaintiff that he would be fired on several occasions. (R. Doc. 34-2 at 4). Finally, Plaintiff claims that during a meeting in October of 2011, Mr. Reaux told Plaintiff and the drivers he supervised that the regional manager, Tony Fagan, wanted to "lynch" all of them for doing a poor job. (R. Doc. 1 at 4).

In the fall of 2011, Store No. 633 expanded to a 'Super Hub.' (R. Doc. 34-11 at 11-12). Due to the increased volume in inventory and orders, Plaintiff requested assistance in the Hub during October of 2011. (R. Doc. 34-12 at 12-15, 18); (R. Doc. 34-11 at 10, 11-14). To help him

out, the district manager, Clint Reaux, brought in Katherine Green as an additional assistant manager, assigned to the Hub and Installer Service Specialists (ISS). (R. Doc. 34-12 at 12-15, 18); (R. Doc. 34-11 at 10-14). On November 18, 2011, Plaintiff was informed of Ms. Green's new position and instructed to report any issues to Ms. Green, as opposed to Cheryl Kimball. (R. Doc. 34-12 at 12-15, 18). Plaintiff viewed this as a demotion, however, and voluntarily resigned that same day. (R. Doc. 34-3 at 18).

## II. LEGAL STANDARD

Summary judgment shall be granted when there are no genuine issues as to any material facts and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56. When a motion for summary judgment is properly made and supported under Rule 56(c), the opposing party may not rest on the mere allegations of their pleadings, but rather must come forward with "specific facts showing that there is a genuine issue for trial." *Matsushita Electric Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); Fed. R. Civ. P. 56(c)(1). The non-movant's evidence is to be believed for purposes of the motion and all justifiable inferences are to be drawn in the non-movant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, summary judgment must be entered against the plaintiff, if he or she fails to make an evidentiary showing sufficient to establish the existence of an element essential to his or her claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Without a showing sufficient to establish the existence of an element essential to the plaintiff's claim, there can be "no genuine issue as to any material fact since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all facts immaterial." *Celotex Corp.*, 477 U.S. at 323.

## III.   DISCUSSION

In his Complaint, Plaintiff asserts race-based disparate treatment, racial harassment and retaliation claims under both Title VII and the LEDL. (R. Doc. 1).  Because Louisiana's Employment Discrimination Law "is similar in scope to [Title VII], Louisiana courts have looked to federal jurisprudence to interpret Louisiana discrimination laws." *King v. Phelps Dunbar, L.L.P.*, 743 So.2d 181, 187 (La. 1999). "Naturally, therefore, a plaintiff who fails to meet his or her burden under Title VII — or who succeeds in doing so — will simultaneously fail to satisfy — or concurrently demonstrate — the prerequisites set forth in Louisiana law." *Martin v. Winn-Dixie Louisiana, Inc.*, 132 F. Supp. 3d 794, 811 (M.D. La. 2015).  As such, the Court will analyze Plaintiff's LEDL and Title VII claims under the precedents applicable to Title VII. *DeCorte v. Jordan*, 497 F.3d 433, 437 (5th Cir. 2007).

### A.   Demotion and Constructive Discharge

Title VII makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race," among other things. 42 U.S.C. § 2000e-2(a)(1).  To state a cause of action under Title VII, a claimant must show that he or she suffered an adverse employment action because of his or her race, or that race was a motivating factor in the employer's decision. *Okoye v. Univ. of Texas Houston Health Science Ctr.*, 245 F.3d 507, 512-513 (5th Cir. 2011) (because of race); *Assariathu v. Lone Star Health Management Associates, L.P.*, 516 F. App'x 315, 321 (5th Cir. 2013) (race was a motivating factor).  Here, Plaintiff claims that he was constructively discharged and demoted in violation of Title VII.

"The constructive-discharge doctrine contemplates a situation in which an employer discriminates against an employee to the point such that his 'working conditions become so

intolerable that a reasonable person in the employee's position would have felt compelled to resign.'" *Green v. Brennan*, -- U.S. -- , 136 S. Ct. 1769, 1776 (2016) (quoting *Pennsylvania State Police v. Suders*, 542 U.S. 129, 141 (2004)); *see also Breeding v. Arthur J. Gallagher & Co.*, 164 F.3d 1151, 1160 (8th Cir. 1999) (for constructive discharge "the facts alleged" must be "so intolerable that a reasonable person would be forced to quit"); *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1015 (7th Cir. 1997) ("[U]nless conditions are beyond 'ordinary' discrimination, a complaining employee is expected to remain on the job while seeking redress."). "When the employee resigns in the face of such circumstances, Title VII treats that resignation as tantamount to an actual discharge." *Green*, 136 S. Ct. at 1776-77.

Ultimately, courts examine the "working environment as a whole, and, to find for the plaintiff, must conclude that the resignation was reasonable under all the circumstances." *Robinson v. Waste Management of Texas*, 122 F. App'x 756, 758 (5th Cir. 2004). This holistic review of the workplace is entirely objective. In other words, the employee's "subjective state of mind . . . is irrelevant." *Robinson*, 122 F. App'x at 758. To aid in this determination, courts have considered the following "factors relevant, singly or in combination: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement on terms that would make the employee worse off whether the offer was accepted or not." *Barrow v. New Orleans S.S. Ass'n*, 10 F.3d 292, 297 (5th Cir. 1994).

Here, none of the items listed above are present here. Although Plaintiff claims he was demoted on November 18, 2011 — the same day he voluntarily resigned — when he was told that Katherine Green would be the new assistant store manager, assigned to the Hub and ISS, the

record indicates that his job title, salary, duties and supervisory responsibilities were never reduced. (R. Doc. 34-3 at 18) (Plaintiff resigned the day he was told Katherine Green was the new assistant manager of Store No. 633).

According to the record, Store No. 633 expanded to a 'Super Hub' around the fall of 2011. (R. Doc. 34-11 at 11-12). Due to the increased volume in inventory and orders, Plaintiff requested assistance in the Hub during October of 2011. (R. Doc. 34-12 at 12-15, 18); (R. Doc. 34-11 at 10, 11-14). To help him out, the district manager, Clint Reaux, brought in Katherine Green as an assistant manager, assigned to the Hub and ISS. (R. Doc. 34-12 at 12-15, 18); (R. Doc. 34-11 at 10-14). Plaintiff was instructed to report any issues to Katherine Green, as opposed to the store manager, Cheryl Kimball. (R. Doc. 34-12 at 12-15, 18).

Plaintiff subjectively viewed this as a demotion, however, the chain of command with respect to Plaintiff's supervisory duties remained the same. The only change was that Plaintiff would report directly to Katherine Green, as opposed to Cheryl Kimball. (R. Doc. 34-12 at 12). Also, Ms. Green was instructed to assist Plaintiff with inventory and deliveries when necessary. (R. Doc. 34-11 at 10) (Ms. Green was going to help Plaintiff pull tickets or make deliveries if a driver didn't show up to work or if order volume was too high). Ms. Green was not taking over Plaintiff's position as Hub Supervisor. (R. Doc. 34-12 at 13). She was simply an assistant manager of the store, assigned to both the Hub and ISS. (R. Doc. 34-12 at 12).

Plaintiff has not introduced any evidence of a reduction in salary, duties, or job title that would support a demotion or even create a genuine issue of material fact concerning the alleged demotion. Moreover, even if the Court assumed Plaintiff were demoted, he foreclosed any claim for constructive discharge by immediately tendering his resignation. (R. Doc. 34-3 at 18) (Plaintiff resigned the same day he learned of Katherine's Green's new position). "A reasonable

employee would, at the very least . . . before resigning . . . seek to remedy the situation with the employer." *Robinson v. Waste Management of Texas*, 122 F. App'x 756, 759 (5th Cir. 2004); *see also Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1015 (7th Cir. 1997) ("[U]nless conditions are beyond 'ordinary' discrimination, a complaining employee is expected to remain on the job while seeking redress.").

Aside from the alleged demotion, Plaintiff's remaining allegations, even if true, are not sufficient to establish a violation of Title VII for constructive discharge based on race. Specifically, Plaintiff alleges that between February 17, 2010 and November 18, 2011, when he voluntarily resigned: (1) he was denied a raise in connection with his promotion; (2) he was subjected to unprofessional language by Cheryl Kimball; (3) his personal stool was removed from his workstation; (4) Mr. Clint Reaux stated that he would fire Plaintiff if he were Plaintiff's supervisor; and (5) during a meeting with the Hub department, Mr. Reaux stated that Tony Fagan was so upset with Plaintiff's department he could "lynch" them. As discussed below, Plaintiff has not introduced evidence sufficient to establish or raise a genuine issue of material fact regarding constructive discharge. The conduct complained of is largely not supported by the record and, even if it were, did not otherwise render Plaintiff's work environment so intolerable that a reasonable person in Plaintiff's shoes would have felt compelled to quit. Moreover, much of the conduct was not perceived by Plaintiff as being racially motivated and the Court likewise does not find it to be racially charged, as would violate Title VII.

First, Plaintiff claims that Mr. Blackwell refused to give Plaintiff a raise within 90 days of his promotion to Hub Supervisor in November of 2010. However, the record indicates that Plaintiff received two raises within two months of his promotion — the first on December 5, 2010 and the second on January 2, 2011. (R. Docs. 34-4 to 34-6); (R. Doc. 34-7 at 23-24). Not

only is Plaintiff's allegation not supported by the record, Plaintiff testified that he did not believe Mr. Blackwell's alleged failure to give him a raise was motivated by race. In his deposition, Plaintiff believed Mr. Blackwell was simply "mean spirited," as opposed to racially-motivated:

> Q:   Okay. But you did receive [raises]. But you're saying that you were promised them earlier?
>
> A:   Yes, ma'am.
>
> Q:   So what about that has to do with you being African-American?
>
> A:   . . . I don't know what it has to do with it. I just was told a bald-faces lie; that's basically what I was [alleging] there. . . . .
>
> Q:   And is it your testimony today that Ronald was given the raise before yours [sic] because he was White and you're African-American?
>
> A:   No, ma'am. . . .
>
> Q:   Okay. So it's not that [Blackwell] said, 'I'm not giving you a raise.' You said he didn't, I guess, respond on the time table that you anticipated?
>
> A:   Yes, ma'am. . . .
>
> Q:   All right. But that has nothing to do with the fact that you're African-American?
>
> A:   I would hope not.

(Pl.'s Dep., R. Doc. 52-3 at 19, 28-32).

Title VII prevents employers from making decisions based on certain protected characteristics, including race. Here, the record does not indicate that Mr. Blackwell made any decisions with respect to Plaintiff's employment on account of Plaintiff's race. As such, even if Mr. Blackwell's failure to give Plaintiff a raise were supported by the record, this conduct could not have violated Title VII or be considered as supporting Plaintiff's claim for constructive discharge, as it was not racially motivated.

Plaintiff further claims that Ms. Kimball, who eventually became his store manager, cursed at him and removed Plaintiff's personal stool from behind his workstation. Concerning Ms. Kimball's alleged cursing, Plaintiff testified that Kimball yelled and cursed at him when one of his drivers delivered the wrong merchandise to Kimball's store. However, Plaintiff's testimony does not establish that he felt Ms. Kimball's conduct was racially motivated:

> A: She said, 'You're a stupid mother f*cker. And you can't understand that these people have to get in the right f*cking truck. I hold you at fault because you're their boss. . . . .
>
> Q: All right. So the reason why . . . Cheryl [Kimball] was upset during that phone conversation was because one of your drivers got in the wrong truck?
>
> A: A better word, delivered the wrong parts. . . .
>
> Q: But she didn't . . . use bad language because you're African-American, and she didn't make any derogatory African-American slurs or anything of that nature?
>
> A: Well, when she called me dumb, that was enough right there. . . . So you could twist that any way you want to twist it. . . . .
>
> A: I've had cursing, all right, directed to me. . . . it was just mean spirited. . . .
>
> Q: All right. So she was mean spirited, but it was not because you were African-American? She was just mean spirited?
>
> A: You would have to go to her mind set to ask her that.

(R. Doc. 52-3 at 34-36, 44). Plaintiff reported this incident to Mr. Blackwell as unprofessional, but did not indicate that he believed Ms. Kimball's outburst was racially motivated. (R. Doc. 52-3 at 34-36). According to Plaintiff, Ms. Kimball used unprofessional language on a second occasion, which took place months later. (R. Doc. 52-3 at 39-42). Even taking Plaintiff's testimony as true, Title VII is not offended by "the ordinary tribulations of the workplace, such as the sporadic use of abusive language," not motivated by some protected characteristic. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

Concerning the removal of his personal stool by Ms. Kimball, Plaintiff claims that this decision was retaliation for complaining to Mr. Blackwell about Ms. Kimball's unprofessional language, months earlier. Plaintiff also claims it was racially-motivated, as Kenneth Wilson (Caucasian), the supervisor of Installer Service Specialists (ISS), was allowed to keep his stool.

To begin, Mr. Blackwell, and not Ms. Kimball, made the decision to remove Plaintiff's stool from his workstation. (R. Doc. 34-10 at 14). But regardless of who made the decision, the record does not support that the removal of Plaintiff's stool was motivated by race. Instead, Mr. Wilson was allowed to keep his stool given the nature of his job as an Installer Service Specialist, not because of his race.

Mr. Blackwell testified that he decided to remove all of the stools from the Hub and the retail counters, but not the ISS (Installer Service Specialists), for several reasons. (R. Doc. 34-10 at 14-19). First, some of the ISS workstations in the Baton Rouge stores "are more desk height" and removing those stools would have required people to work "hunched over." (R. Doc. 34-10 at 17). Second, the ISS positions are more tied to their workstations, as those employees spend "80 or 90 percent" of their time answering phones at their workstations. (R. Doc. 34-10 at 17). Hub employees like Plaintiff, however, "were always moving, always pulling parts, you were always doing something. There was no opportunity to sit down." (R. Doc. 34-10 at 18-19). Given the nature of the Hub, Mr. Blackwell explained that he "had the stools removed" because it was "a productivity issue. People were sitting on the stools when they should have been out taking care . . . of the daily tasks of the store." (R. Doc. 34-10 at 16). Although not mentioned by Plaintiff, Mr. Leroy Scales, an African-American Installer Service Specialist, was also permitted to use a stool. (R. Doc. 52-9 at 21). As such, the record does not support Plaintiff's contention

that the removal of his stool was motivated by race. The removal of Plaintiff's stool was likewise not retaliatory, as discussed later.

Next, Plaintiff claims that Mr. Clint Reaux commented on several occasions that he would fire Plaintiff if he were Plaintiff's supervisor.  Concerning Mr. Reaux's comments that he wished to fire Plaintiff, Plaintiff again did not testify that he felt Mr. Reaux's comments were racially motivated:

> Q: So why would [Mr. Reaux] say that?
>
> A: Why would he say it?
>
> Q: Yeah.
>
> A: I rode up here saying the same thing. Because you know why? I'm going to answer you why he would say it: Because he did it.

(R. Doc. 52-4 at 18-19).  Again, this conduct, even if true, cannot offend Title VII as Plaintiff did not perceive it as being racially motivated.  Title VII "does not set forth a general civility code for the American workplace." *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).  While Plaintiff now suggests in his Opposition to summary judgment that the conduct above was racially motivated, his testimony makes clear that he did not perceive these actions as being based on race at the time they occurred or later during his deposition.  Ms. Taplin similarly testified: "It's more of I think personally they just didn't like Gregory's character." (R. Doc. 52-5 at 37).

The only alleged conduct carrying any racial connotation is Plaintiff's allegation that Mr. Reaux stated that Tony Fagan was so upset with Plaintiff's department that he could "lynch" them.  The Court does not dispute that a comment about lynching is racially charged and is never appropriate or acceptable in the workplace.  Nonetheless, this comment cannot justify Plaintiff's voluntary resignation, whether considered alone or in combination with Plaintiff's remaining

allegations. *See Brown v. Bunge Corp.*, 207 F.3d 776, 782-83 (5th Cir. 2000) (employee who was demoted without a pay-cut, given fewer job responsibilities and badgered about retiring was not constructively discharged); *Robinson Waste Management of Texas*, 122 F. App'x 756, 759 (5th Cir. 2004) (repeated denials for promotion opportunities to female employee and harassing comments by supervisor were insufficient to state a claim for constructive discharge); *but see Wilson v. Monarch Paper Co.*, 939 F.2d 1138, 1145 (5th Cir. 1991) (managerial employee with college degree was constructively discharged where he was reassigned to janitorial duties).

Finally, Plaintiff's claim for constructive discharge is foreclosed as he did not seek to remedy the alleged situation with Defendant prior to his resignation. Plaintiff testified that he internally complained about the time Ms. Kimball cursed at him over a mistake made by one of his drivers. Otherwise, he did not pursue any of the avenues made available by Defendant to lodge complaints after the alleged incidents. (R. Doc. 34-3 at 17). "A reasonable employee would, at the very least . . . before resigning . . . seek to remedy the situation with the employer." *Robinson v. Waste Management of Texas*, 122 F. App'x 756, 759 (5th Cir. 2004); *see also Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1015 (7th Cir. 1997) ("[U]nless conditions are beyond 'ordinary' discrimination, a complaining employee is expected to remain on the job while seeking redress."). As such, the Court finds Plaintiff cannot establish any genuine issues at to any material facts with respect to his demotion or constructive discharge. Therefore, Defendant's Motion for Summary Judgement is **GRANTED** as to Plaintiff's disparate treatment claims (alleging demotion and constructive discharge) under both Title VII and the LEDL.

### B.   Harassment

Plaintiff additionally claims that the above conduct also constitutes racial harassment in violation of Title VII. To state a claim for racial harassment, an employee must show: "(1) that

the employee belongs to a protected class; (2) that the employee was subject to unwelcome [ ] harassment; (3) that the harassment was based on [a protected characteristic]; and (4) that the harassment affected a 'term, condition, or privilege' of employment.'" *E.E.O.C. v. Boh Bros. Const. Co.*, 731 F.3d 444, 453 (5th Cir. 2013).

As previously discussed, Plaintiff's own testimony indicates that the majority of the conduct listed above was not racially-motivated or even supported by the record. In fact, only the alleged "lynching" comment, an isolated incident, carries a clear racial connotation. Nonetheless, even if the Court assumed that the alleged conduct occurred and was motivated by race, it is neither sufficiently severe nor pervasive to constitute harassment. "[C]omplaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, [off-color] jokes, and occasional teasing" will not amount to a violation of Title VII. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). Because there are no genuine issues as to any material facts concerning Plaintiff's claim for racial harassment, Defendant's Motion for Summary Judgment is **GRANTED** as to Plaintiff's claim for racial harassment under both Title VII and the LEDL.

    C.    **Retaliation**

Like his other claims, Plaintiff claims that Defendant's alleged retaliation violated both Title VII and the LEDL. While both Title VII and the LEDL have long prohibited race-based discrimination (e.g., disparate treatment and harassment), the LEDL did not recognize a cause of action for retaliation until August 1, 2014, when the legislature amended Louisiana Revised Statute § 51:2256(1). *Compare Martin v. Winn-Dixie Louisiana, Inc.*, 2015 WL 1281943, at *7-8 (after August 1, 2014, the LEDL now recognizes a cause of action for retaliation), *and Corley v. Louisiana, Office of Risk Management*, 498 F. App'x 448, 451 (5th Cir. 2012) (Prior to the 2014

amendments, the Fifth Circuit recognized: "Retaliation . . . does not fall within the scope of Louisiana Employment Discrimination Law."), *with* Title VII of the Civil Rights Act of 1964, Pub. L. No. 88-352, § 704, 78 Stat. 241, 257 (1964) (codified as amended at 42 U.S.C. § 2000e-3(a) (1972)) (Title VII has prohibited retaliation since its enactment in 1964), *and Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006) ("The antiretaliation provision [of Title VII] seeks to secure that primary objective by preventing an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees.").

So, when Plaintiff filed this lawsuit on July 29, 2014, a cause of action for retaliation existed under Title VII, 42 U.S.C. § 2000e-3(a), but not the LEDL. *See Martin*, 2015 WL 1281943, at *8 (Because plaintiff filed his complaint on September 24, 2014, he did not state cause of action for retaliation under LEDL. The "amendment did not become effective until August 1, 2014 [and] [n]o mention of intent to apply this amendment retroactively was made by the legislature."); *Liles v. Burkes Outlet Stores, LLC*, 2015 WL 1975844, at *4 n.5 (W.D. La. May 1, 2015) ("Accordingly, because Liles filed her complaint [(on October 3, 2014)] once La. R.S. § 51:2256 was effective in its current version, Liles has a statutory basis for asserting a retaliation claim under the LEDL.").

Because Plaintiff does not have a viable cause of action for retaliation under the LEDL, Defendant's Motion for Summary Judgment is **GRANTED** as to Plaintiff's state-law retaliation claim. The Court's remaining analysis is therefore limited to Title VII.[1]

---

[1] Even if Plaintiff had a valid cause of action for retaliation under the LEDL, the analysis and reasoning provided below regarding his Title VII retaliation claim would likewise apply to any such claim under the LEDL, and dismissal would be appropriate for those reasons as well.

Title VII makes in unlawful for an employer to retaliate against an employee who engages in protected activity by opposing an employment practice made unlawful by Title VII. 42 U.S.C. § 2000e-3(a).  To establish a prima facie case of retaliation, "a plaintiff must first show that (1) she participated in an activity protected under the statute; (2) her employer took an adverse employment action against her; and (3) a causal connection exists between the protected activity and the adverse action." *Feist v. Louisiana*, 730 F.3d 450, 454 (5th Cir. 2013).

To constitute protected activity, "a plaintiff's complaint — whether formal or informal — must still concern a discriminatory practice in order to form the basis of a retaliation claim under an anti-discrimination law." *Guillen v. Calhoun County*, 2012 WL 1802617, at *3 (S.D. Tex. May 16, 2012).  "Title VII does not protect opposition to all forms of unscrupulous conduct." *Brown v. United Parcel Service, Inc.*, 406 F. App'x 837, 840 (5th Cir. 2010).  Instead, the Act only protects opposition to discrimination based on "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  "Therefore, the relevant question is not whether a formal accusation of discrimination is made but whether the employee's communications to the employer sufficiently convey the employee's reasonable concerns that the employer has acted or is acting in an unlawful discriminatory manner." *Yount v. S & A Restaurant Corp.*, 226 F.3d 641, at *3 (5th Cir. 2000); *see also Brown*, 406 F. App'x at 840 ("Magic words are not required, but protected opposition must at least alert an employer to the employee's reasonable belief that unlawful discrimination is at issue.").

Here, Plaintiff claims that Cheryl Kimball removed his personal stool from his workstation in March of 2011 as retaliation for Plaintiff complaining about Ms. Kimball's use of unprofessional language months earlier.  Having reviewed the entire record, the Court finds

Plaintiff has failed to establish the first prong of his prima facie case — that he engaged in protected activity.

The record indicates that Plaintiff, accompanied by Ms. Taplin, complained to Mr. Blackwell that Ms. Kimball used curse words during an outburst following a mistake by one of Plaintiff's drivers. (R. Doc. 52-3 at 34-35); (R. Doc. 52-3 at 34) (Plaintiff's account of Ms. Kimball's cursing). Plaintiff testified that he did not lodge any other internal complaints with Defendant. (R. Doc. 34-3 at 17).

At no point did Plaintiff give any indication to either Ms. Taplin or Ms. Blackwell that he was complaining of conduct that violated Title VII, as opposed to a general workplace dispute. In Plaintiff's own Complaint, he says that he reported the "extremely offensive, unprofessional language," to Mr. Blackwell. (R. Doc. 1 at 2-3). Ms. Taplin similarly testified that Plaintiff reported Ms. Kimball's behavior as "unprofessional." (R. Doc. 52-5 at 34-35).

Under the circumstances, it does not appear that Plaintiff believed the conduct violated Title VII at the time of his internal complaint; and even if he did, Plaintiff's complaint was not sufficient to alert Defendant to his "reasonable belief" that "unlawful discrimination" was at issue. *Brown*, 406 F. App'x at 840 ("Magic words are not required, but protected opposition [to discrimination] must at least alert employer to the employee's reasonable belief that unlawful discrimination is at issue); *see also Barber v. CSX Distribution Services*, 68 F.3d 694, 701-02 (3d Cir. 1995) ("Barber's letter to Human Resources complains about unfair treatment in general . . . . However, that letter does not explicitly or implicitly allege that age was the reason for the alleged unfairness. A general complaint of unfair treatment does not translate into a charge of illegal age discrimination."); *Garcia-Paz v. Swift Textiles, Inc.*, 873 F. Supp. 547, 560 (D. Kan. 1995) ("the wide range of protected activity clearly does not include those situations where the

opposition relates not to unlawful employment practices but to a personal grievance"); *Dupont–Lauren v. Schneider, Inc.*, 994 F. Supp. 802, 823 (S.D. Tex. 1998) (holding employee's statement did not constitute opposition where she made vague comments that failed to apprize employer of any particular practices she viewed as discriminatory or unlawful, nor did she accuse any particular co-worker or supervisor of discrimination).

The Court finds Plaintiff has failed to establish the first prong of his prima facie case — that he engaged in protected activity.  As such, Defendant's Motion for Summary Judgment is **GRANTED** as to Plaintiff's Title VII retaliation claim.

## IV.   CONCLUSION

For the reasons given above, Defendant's Motion for Summary Judgment (R. Doc. 34) is **GRANTED** and Plaintiff's cause of action is **DISMISSED with prejudice**.

Signed in Baton Rouge, Louisiana, on September 29, 2016.

_____
**RICHARD L. BOURGEOIS, JR.
UNITED STATES MAGISTRATE JUDGE**